UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| MARY ANNE L., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:21-cv-566-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Mary Anne L. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for Disability Insurance Benefits ("DIB") under Title II of the Act, and her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 15).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9,10. Plaintiff also filed a reply. *See* ECF No. 11. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 9) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 10) is **GRANTED**.

## <u>BACKGROUND</u>

Plaintiff protectively filed an application for DIB on February 4, 2016, and an application for SSI on January 28, 2016. Transcript ("Tr.") 175, 357-71, In both applications, Plaintiff alleged disability beginning April 18, 2014 (the disability onset date), due to herniated discs, asthma,

obesity, and depression. 175.526. The claims were denied initially on May 23, 2016, after which Plaintiff requested an administrative hearing. Tr. 175, 205-12, 213-14.

On April 16, 2018, Administrative Law Judge Carl E. Stephan ("ALJ Stephan") conducted a hearing in Buffalo, New York, at which Plaintiff appeared and testified and was represented by Darlene Westphal, a non-attorney representative. Tr. 175. ALJ Stephan issued an unfavorable decision on July 6, 2018, denying the claim (Tr. 172-91), and on May 17, 2019, the Appeals Council issued an order remanding the case (Tr. 192-95).

On February 24, 2020, Plaintiff appeared and testified at a new hearing before Administrative Law Judge Bryce Baird ("the ALJ"). Tr. 21. Plaintiff was represented by Phillip V. Urban, an attorney. *Id*. Elizabeth C. Laflamme, an impartial vocational expert, also appeared and testified at the hearing. *Id*. On April 9, 2020, the ALJ issued a second unfavorable decision, finding that Plaintiff was not disabled. Tr. 18-49. On March 17, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 6-12. The ALJ's April 9, 2020 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations

omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.   The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the

Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his April 9, 2020 decision:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.

2. The claimant has not engaged in substantial gainful activity since April 18, 2014, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: lumbar spine degenerative disc disease status post 2019 fusion; obesity; asthma; mild right carpal tunnel syndrome; major depressive disorder; and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)[1] except the claimant can lift and carry 10 pounds occasionally and 5 pounds frequently. She can sit for up to six hours in an eight-hour workday, and she can stand and/or walk for up to two hours in an eight-hour workday. The claimant can occasionally climb ramps and stairs, but she can never climb ladders, ropes, and scaffolds. The claimant can occasionally balance, stoop, kneel, and crouch, but she can never crawl. She can frequently handle and finger with her right hand. She must use a handheld assistive device for walking over uneven terrain or for prolonged ambulation. The claimant is limited to environments in which there is no exposure to excessive cold, excessive heat, and excessive moisture or humidity. She can have no concentrated exposure to pulmonary irritants such as odors, fumes, dusts, gases, and poor ventilation. The claimant can perform work that is limited to simple, routine tasks that can be learned after

---

[1] "Sedentary" work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

a short demonstration or within 30 days. She can perform work that allows her to be off task 5% of the workday in addition to regularly scheduled breaks. She can perform work that does not require more than simple work-related decisions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 30, 1977 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 18, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 23-40.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on February 4, 2016, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 41. The ALJ also determined that based on the application for supplemental security income protectively filed on January 28, 2016, the claimant is not disabled under section 1614(a)(3)(A) of the Act. *Id*.

## ANALYSIS

Plaintiff asserts two points of error. First, Plaintiff argues that the off-task time limitation in the ALJ's RFC finding was not supported by substantial evidence. *See* ECF No. 9-1 at 2, 13-16. Next, Plaintiff argues that the ALJ erred in his consideration of the opinions of consultative psychologist Gina Zali, Psy.D. ("Dr. Zali"), and state agency reviewing physician J. Ochoa ("Dr. Ochoa"). *See id*. at 2, 17-21.

In response, the Commissioner argues that the ALJ engaged in a thorough analysis when considering Plaintiff's mental impairments and limitations, and the ALJ's off-task limitation was based on the longitudinal record, including the opinion evidence, as well as Plaintiff's subjective complaints, and therefore, the limitation was supported by substantial evidence. *See* ECF No. 10-1 at 7-14. Further, argues the Commissioner, the ALJ specifically noted that he was accounting for Plaintiff's reports of pain with a 5% off-task limitation, and as such, credited Plaintiff's subjective complaints in the context of the overall objective medical evidence. *See id*. at 9. The Commissioner also argues that the ALJ reasonably considered the opinions of Dr. Zali and Dr. Ochoa and clearly explained his rationale for assigning "some weight" to Dr. Zali's opinion and "substantial weight" to Dr. Ochoa's opinion, and the ALJ's assignment of weight was supported by substantial evidence. *See id*. at 14-18.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ thoroughly considered the evidence of record, including treatment notes containing contemporaneous statements of functionality, the opinion evidence, and Plaintiff's activities of daily living, and reasonably concluded that Plaintiff could perform sedentary work with additional exertional and non-exertional limitations. Furthermore, the ALJ's assignment of weight to Dr. Zali and Dr. Ochoa's opinions was supported by substantial evidence. Finally, the Court finds that the ALJ clearly explained his rationale for the 5% off-task limitation, pointing to an abundance of record evidence,

including Plaintiff's own statements, treatment notes documenting physical and mental status examinations, and objective findings such as imaging results. Accordingly, the Court finds no error.

As noted above, Plaintiff alleges disability based on her back issues as well as depression and anxiety. Tr. 183. At her February 24, 2020 hearing, Plaintiff testified that she recently had back surgery and was still adjusting to having a brace. Tr. 69. At the time of the hearing, she was on Gabapentin and had been on hydrocodone in the past for her back pain. Tr. 71. She also testified that she must take sleep medication due to her back pain and her shingles. Tr. 73. She furtherA testified that she attends counseling every four weeks, depending on her schedule. Tr. 78.

On June 19, 2014, Plaintiff presented to Jericho Road Community Health Center ("JRCHC") to re-establish care. Tr. 662-64. She reported "feeling well in general" and "exercis[ing] a lot" despite complaints of swelling in the legs and back pain. Tr. 662. Plaintiff had a BMI of 46.6 but appeared healthy. Tr. 663. Her physical examination was otherwise unremarkable and treating nurse practitioner Takesha Leonard ("Ms. Leonard") recommended exercise for 30 minutes a day at least four days a week. Tr. 663-64.

Plaintiff followed up at JRCHC on October 16, 2014, complaining of depression and back pain since 2002; however, she denied signs and symptoms associated with depression. Tr. 659. She stated that she had applied for public assistance and SSI and needed paperwork completed that day. *Id*. On examination, Plaintiff had normal gait; mildly limited range of motion in the spine; negative straight leg raise testing; normal heel-to-toe walk; and the ability to tiptoe. Tr. 660. She was instructed to remain active for 60 minutes a day and to avoid heavy lifting and strenuous back exercises. Tr. 660-61. Ms. Leonard noted that Plaintiff was able to work with some restrictions. Tr. 660. She also assessed Plaintiff with "depressive disorder not otherwise specified" and referred Plaintiff to counseling for further evaluation and management of her symptoms. Tr. 661.

On January 8, 2015, Plaintiff was seen for a psychiatric consultative examination by Christine Ransom, Ph.D. ("Dr. Ransom"). Tr. 667-70. Dr. Ransom assessed mild difficulty performing complex tasks, relating with others, and appropriately dealing with stress. *Id*. Plaintiff underwent an internal medicine consultative examination on January 9, 2015, by Samuel Balderman, M.D. ("Dr. Balderman"), who opined to mild physical limitations. Tr. 672-75.

On May 20, 2015, state agency psychological consultant Dr. J. Ochoa opined that Plaintiff had mild restriction of activities of daily living, mild difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace. Tr. 147. Dr. Ochoa opined that Plaintiff was able to complete simple and mildly complex tasks with sustained attention and pace tolerance; and she could interact with others to meet work needs, adapt to work related changes, and make work related decisions. Tr. 153.

The record reflects that Plaintiff received mental health treatment at Horizon Corporations ("Horizon") starting in September 2015. Tr. 683-88. She was assessed with unspecified anxiety disorder and unspecified depressive disorder. Tr. 682. Plaintiff was discharged from Horizon on February 5, 2016. Tr. 689-92. She had attended only one out of six counseling sessions, either no-showing or canceling right before the appointment time. Tr. 690.

On June 29, 2015, Plaintiff established primary care at UBMD Physicians Group ("UBMD"). Tr. 820-25. She reported a history of herniated discs that were getting worse. Tr. 820. Surgery had been recommended, but she was reluctant to pursue it. *Id*. She also reported depression and wanted to see a counselor. *Id*. Plaintiff was seen for a follow-up visit on July 9, 2015, reporting her back pain was "horrible" and aggravated by walking. Tr. 806-10. She stated "[s]he was in PT many years ago;" her "[l]ast MRI was some years ago; and "[s]he would like to start the process again with PT and back x-ray at this time." Tr. 820. Naprosyn and Gabapentin were

increased, and Lidoderm cream was added. Tr. 810. Plaintiff was advised that she needed to "call neurosurgeon and pain management as this [could] be a long process for her." *Id*.

On October 7, 2015, Plaintiff was seen at UBMD for a follow-up visit after being treated in the emergency room ("ER"). Tr. 801-05. She had presented to "MASH" on September 27, 2015, after "3-4 days of vomiting, dizziness, abdominal pain, headaches and diarrhea" and "urinary frequency for about 3-4 days as well." Tr. 801. Her blood work came back normal, but her urinalysis showed a UTI (urinary tract infection), for which she was prescribed Cipro. *Id*. She reported improved symptoms after five days of Cipro. *Id*. She also started taking Omeprazole which improved her abdominal pain. *Id*. Plaintiff's physical examination was essentially normal although she had "moderate tenderness in the epigastric area." Tr. 804. An EGD (esophagogastroduodenoscopy, also known as an upper endoscopy) was recommended due to her persistent gastric symptoms. Tr. 805.

An x-ray of the lumbar spine on November 5, 2015, showed degenerative changes over the lower lumbar spine. Tr. 830. An EGD on November 12, 2015, showed "mild erythema, normal endoscopy without any evidence of esophagitis, hiatal hernia, Barret's appearing mucosa, gastric ulceration or erosion or pyloric deformity." Tr. 832-33.

On February 8, 2016, Plaintiff was seen at UBMD for an ER follow-up visit. Tr. 796-800. She had been seen in the ER at "St. Joe's" (Sisters of Charity Hospital, St. Joseph Campus) for left breast pain, dizziness, and headache. Tr. 796. Her blood work returned normal, and she was discharged with Anaprox, which helped with the swelling and tenderness. *Id*. She reported she was "currently under a lot of stress at home" and "not really sleeping well." *Id*. She also requested a referral to a bariatric specialist for her weight. *Id*.

On March 30, 2016, Plaintiff was seen for a neurosurgical consultation at UB Neurosurgery. Tr. 880-81. She reported that she had been hit by a motor vehicle in 2002 and had

some back and right leg pain since that accident. Tr. 880. However, she reported that most of her current pain, started after she slipped and fell on some stairs a couple of years ago. *Id*. She also reported that she was seeing a pain management doctor, but she had not received any conservative treatment. *Id*. She was taking "Hydrocodone once or twice a day along with an NSAID and Methocarbamol." *Id*. She was also taking Gabapentin, which had been prescribed by her primary care physician. *Id*.  On physical examination, she was noted to be obese; she was pleasant and cooperative; and she had a slow, antalgic gait with use of cane. Tr. 881. She had good strength, reflexes, and muscle tone bilaterally in the lower extremities; decreased sensation on the right compared to the left; negative straight leg raise testing; and no evidence of myelopathy, clonus, fasciculations, edema or lymphadenopathy. *Id*. A course of physical therapy was recommended after which she was to return in two months, and if no improvement, a lumbar MRI would be obtained to further evaluate her symptoms. *Id*.

On May 9, 2016, Plaintiff was seen by Hong-Biao Liu, M.D. ("Dr. Liu"), for an orthopedic consultative examination. Tr. 727-33. Dr. Liu noted that Plaintiff walked slowly with a cane, which has been prescribed by a physician (Tr. 728), and assessed moderate limitations for walking, bending, and kneeling; and she should avoid dust and other irritants. (Tr. 729). Imaging showed mild narrowing at L4-5. Tr. 731.

On May 9, 2016, Plaintiff was seen by Gina Zali, Psy.D. ("Dr. Zali"), for a psychiatric consultative evaluation. Tr. 734-38. Plaintiff presented with adequate manner of relating and her demeanor and responsiveness to questions was cooperative. Tr. 735. Her affect was full range and appropriate in speech and thought content, and her mood was dysthymic. Tr. 736. Her attention and concentration were intact, and she could count, perform simple calculations, and serial 3s without errors. *Id*. Her recent and remote memory skills were mildly impaired likely due to anxiety in the evaluation. *Id*. Her intellectual function was estimated as average; her insight was limited;

and her judgment was fair. *Id*. Dr. Zali diagnosed Plaintiff with "rule out borderline personality disorder, unspecified anxiety disorder, rule out depressive disorder, and rule out excoriation disorder." Tr. 737.

Dr. Zali assessed moderate limitations in learning new tasks and making appropriate decisions; and marked limitations in appropriately dealing with stress. *Id*. Dr. Zali opined that Plaintiff evidenced no limitations with the ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule; moderate limitations learning new tasks; no limitations performing complex tasks; moderate limitations making appropriate decisions; no limitations relating adequately with others; and marked limitations appropriately dealing with stress. *Id*. Dr. Zali stated that the results of the evaluation appeared to be consistent with psychiatric problems and this may significantly interfere with Plaintiff's ability to function daily; however, she further opined that Plaintiff's prognosis was "good," provided that she continued with treatment and vocational training. *Id*.

Plaintiff re-established care at Horizon on May 20, 2016, due to symptoms of anxiety and depression. Tr. 844. She reported symptoms including feeling overwhelmed, racing thoughts, difficulty concentrating, panic attacks, anxiety, fatigue, isolation, and paranoia. *Id*. On mental status examination, Plaintiff had cooperative behavior and clear speech, but depressed affect; her thought process was logical and thought content was appropriate, but she had some paranoia. Tr. 855. She also had intact memory and attention, and her insight and judgment were good. *Id*. She was assessed with major depressive disorder. Tr. 864.

A subsequent mental status examination at Horizon on June 22, 2016 showed Plaintiff to have appropriate behavior and good eye contact. Tr. 864-71. She had depressed mood; her thought process was logical, and she had fair judgment. Tr. 865-66. She had intact memory and fair

concentration. Her insight was fair. *Id*. Plaintiff felt that Lexapro was helpful, and her dose was increased; she was also continued on trazodone and encouraged to take it without other medications. Tr. 869.

On May 10, 2016, Plaintiff was seen at UBMD. Tr. 788-91. She was starting the process of getting cleared for weight loss surgery. Tr. 788. Her hemoglobin ("Hgb") A1C was 8.3%; her liver enzymes were elevated; and she had low iron and a Vitamin D deficiency. Tr. 788, 791. The bariatric surgeon wanted these issues treated before scheduling surgery. Tr. 788.

Plaintiff was evaluated at All Care Physical Therapy ("All Care") on May 24, 2016. Tr. 750. She had tenderness in the lumbar spine and positive straight leg raise testing. *Id*. Thereafter, she attended physical therapy, which noted improved symptoms. Tr. 751-64. Plaintiff was noted to be morbidly obese and advised to work on weight loss. *Id*. On October 22, 2016, Plaintiff was discharged from All Care for failure to attend any appointments in two months. Tr. 765. She had attended 15 appointments and shown 70% improvement. *Id*.

On May 31, 2016, Plaintiff was seen for further follow-up at UB Neurosurgery. Tr. 882-83. She reported that she had attended one session of physical therapy and was pursuing gastric sleeve surgery for weight loss. Tr. 882. She reported she had attempted to apply for SSI and was recently denied. *Id*. Physical examination findings were unchanged, and it was noted that she was not a good surgical candidate because of her obesity. Tr. 883. It was noted that Plaintiff's symptoms might improve after the weight loss surgery, and she was encouraged to continue physical therapy and "possibly continue with injections" and return in three months *Id*.

On June 16, 2016, Plaintiff was seen at UBMD for an exacerbation of lower back pain that had started the day before. Tr. 784-87. She reported that the pain started to radiate up her middle back, and her pain was 5/5. Tr. 784. She also wanted to know why she was denied for disability. *Id*. Plaintiff was directed to use "Medrol dose Pak" and instructed to call pain management for

future flares, as her UBMD provider could no do any controlled substances. Tr. 787. Her provider also explained that the disability form came one month after Plaintiff's first visit, and because there were no records from previous studies or recommendations, Plaintiff "need[ed[ to get better explanation from specialist." *Id*.

An MRI of the lumbar spine on August 24, 2016, showed disc protrusion to the left of midline producing moderate lateral recess stenosis; and small disc protrusion at L5-S1.

Plaintiff was seen at Synergy Bariatrics on November 17, 2016. Tr. 766-68. She was 4'11" and weighed 225 pounds. Tr. 766. Because dietary weight loss attempts had failed and because of "associated comorbidities," Plaintiff wanted to be considered for a sleeve gastrectomy. *Id*. She had lost five pounds from her previous visit in April 2016 and was taking Metformin. *Id*. On December 1, 2016, Plaintiff was seen at UBMD for a pre-operative visit. Tr. 777-83. She was scheduled for a gastric sleeve procedure on December 5, 2016.

On December 13, 2016, Plaintiff was seen at Synergy Bariatrics for her first post-operative visit. Tr. 916-17. She stated she was "feeling alright" but complained of nausea from the fusion multivitamins. Tr. 916. She was able to tolerate clear and full liquids, string cheese, and eggs. *Id*. She had not yet started tracking calories and protein, and she was drinking around 32 ounces of fluid daily. *Id*. Plaintiff reported no complaints at her second post-op visit on January 17, 2017. Tr. 918-19. At her three-month post-op visit on March 7, 2017, Plaintiff was feeling well and had no complaints. Tr. 920-21. She had not been tracking calories and protein, and she was unsure about her fluid intake. *Id*.

On August 13, 2017, Plaintiff was seen at Synergy Bariatrics for a six-month post-op visit, reporting that she felt well and had no new complaints. Tr. 922-23. She stated that she was not tracking calories and protein; she was drinking around 64 ounces of fluid daily; and she was walking for exercise. Tr. 922. On August 16, 2017, Plaintiff again had no complaints but noted

that her weight loss had stalled. Tr. 925-26. She was not tracking her meals, so she was unsure of her protein and calorie intake. Tr. 925. She stated she was working with a nutritionist; she also stated that she does "a lot of walking" and just started strength exercises at home. *Id*.

On August 22, 2017, Plaintiff was seen at UBMD for a follow-up visit. Tr. 890-94. She reported she had "come to a stop with her weight loss," and she was not happy with Dr. Aurora, her pain management physician, because he cut back on her medications and did not know he was supposed to do a trigger injection at her last visit. Tr. 890.

On September 6, 2017, Plaintiff was seen at St. Joe ER complaining of chronic back pain for the past three days. Tr. 1374-83. She reported her pain was 9/10. Tr. 1375. She also reported she was being treated by pain management, but she had missed an appointment at the end of August and had not been able to make another appointment. Tr. 1378. She was administered Medrol and discharged home with a prescription for Prednisone. Tr. 1377-78.

On November 15, 2017, treatment records from Horizon show that Plaintiff reported being stressed with caring for her grandson daily, as well as caring for her mother with shingles. Tr. 903-08. Mental status examination showed Plaintiff to have good eye contact and normal activity. Tr. 904. She had cooperative attitude; her mood was dysphoric and stressed; her thought content was appropriate; and thought process was logical. *Id*. She had normal cognitive status, and fair insight and judgment. Tr. 905. She was continued on Lexapro and trazodone. Tr. 907.

Plaintiff was seen at Synergy Bariatrics on January 5, 2018, one year following her sleeve gastrectomy. Tr. 927-28. She reported she was "feeling well" since her last visit, but she was discouraged by her lack of weight loss over the last five months. Tr. 927. She reported she was keeping a food journal but gave up because it was "too time consuming" and "she wasn't seeing any results." *Id*.  She was no longer tracking meals or exercising. *Id*. Plaintiff also reported being under a lot of stress because she was caring for her two-year-old grandson. *Id*. She stated that she

averages 3-4 hours of sleep every evening. *Id*. Although she goes to counseling, she reported she is "on the third provider at the practice" and "is not as comfortable with the one she sees now." *Id*.

Plaintiff was seen at Horizon on January 10, 2018. Tr. 909-14. She was "stressing" and frustrated with her weight. Tr. 912. She had trouble with caring for her grandson, finances, and home. *Id*. On mental status examination, Plaintiff had good eye contact; cooperative attitude; and stressed mood. Tr. 910. Her thought content was appropriate, and her thought process was logical. Id. She had normal cognitive status and fair insight and judgment. Tr. 910-11.  She was continued on the same medications. Tr. 913.

On June 5, 2018, Plaintiff was seen at St. Joe ER complaining of low back pain after a motor vehicle accident. Tr. 1420-30.  She received pain medication and was discharged home. Tr. 1424.  Plaintiff returned to the ER on June 6, 2018, again for back pain from the previous day's motor vehicle accident. Tr. 1434-42. She was again administered pain medications and discharged home. *Id*.

On June 12, 2018, Plaintiff was seen at UBMD for follow up from her automobile accident on June 5, 2018. Tr. 998-1002. She complained of neck, upper, and lower back pain. Tr. 998. A June 15, 2018 lumbar MRI showed moderate large central and left paracentral disc herniation with extrusion, moderate left paracentral disc herniation, and severe right L5-S1, moderate left L4-5 and mild left L3-4 foramen stenosis. Tr. 974.

On June 22, 2018, Plaintiff had an initial consultation at Greater Buffalo Accident and Injury Chiropractic, complaining of frequent headache pain on the right, pressure on the back of the head, and back and neck pain. Tr. 930-36. She reported she had been in an automobile accident on June 5, 2018; she was rear-ended causing her to be "shoved forward and whipped backward within the vehicle." Tr. 931. On examination, she had limited cervical and lumbar range of motion. Tr. 933-35. Plaintiff was scheduled to receive treatment three times per week. Tr. 930. An MRI of

the cervical spine on July 9, 2018, showed prominent straightening and a vertebral subluxation complex. Tr. 940-43. Plaintiff continued treatment through February 2019, at which time "some improvement in symptomatology" was noted, but her "condition remain[ed] chronic." Tr. 937-71.

Plaintiff had nerve conduction studies of her upper and lower extremities on July 30, 2018, which showed mild to moderate right sensorimotor carpal tunnel syndrome primarily affecting myelin. Tr. 1857-60.

On September 25, 2018, Plaintiff was seen for a neurosurgical consultation at UB Neurosurgery, reporting that she had reinjured herself in a second car accident on June 5, 2018. Tr. 1562-64. Since that time, she reported having "severe diffuse body wide pain, especially in the right upper extremity and right lower extremity with numbness and tingling in her arms and legs. At times, her right leg gives out." Tr. 1562. She had been referred by her chiropractor. *Id*. An MRI of the cervical spine taken that summer was "completely normal." Tr. 1563. A comparison of her current lumbosacral MRI with a similar study from DENT Neurologic Institute taken in 2016 showed "midline to left paracentral disc herniations at L4-5 and L5-Sl with a significant amount of epidural lipomatosis." *Id*. Plaintiff was recommended to continue with "conservative management," as there was "no viable neurosurgical option for her." *Id*.

On February 21, 2019, Plaintiff was seen at UBMD for an annual physical. Tr. 1007-15. She had abnormal gait and used a cane. Tr. 1011. It was noted that a CT scan on February 18, 2019, showed spondylosis of the lumbar spine. Tr. 1012. On March 25, 2019, Plaintiff was seen for an ER follow-up visit. Tr. 987-91. She had been seen at St. Joe ER on February 18, 2019, complaining of sharp pain in the back of her legs and buttocks. Tr. 987. A CT of the lumbar spine was obtained and showed spondylosis at L4-L5 and L5-S1 levels. *Id*.  Tr. 987, 1026. She was given a muscle relaxer and pain medicine, including Cyclobenzaprine and Hydrocodone. Tr. 987.

On May 3, 2019, Plaintiff had an initial consultation at Spine Surgery of Buffalo Niagara, upon referral from her chiropractor. Tr. 1752-55. On May 8, 2019, she underwent a trigger point injection for myofascial pain and myalgia. Tr. 1789. An MRI of the cervical spine on June 3, 2019, showed straightening of the lordosis, and disc herniation at C6-7; and imaging of the lumbar spine showed retrolisthesis, decreased disc height at L5-S1 and L4-5. Tr. 1790-96.

On June 27, 2019, Plaintiff was seen at Spine Surgery of Buffalo Niagara for follow-up of her lumbar and cervical spine MRIs. Tr. 1756-60. She reported that her low back was still more painful than her neck, which she graded at 9/10 in intensity. Tr. 1757. She also continued to complain of anterior thigh pain bilaterally that was 8/10 in intensity; her legs were feeling weak; and she continued to use a cane for help with ambulation. *Id*. She was next seen on July 3, 2019, complaining of severe pain aggravated by lifting, sitting, standing, and walking. Tr. 1761-66. On October 22, 2019, she reported her pain was less, at 6/10. Tr. 1767-71.

On July 25, 2019, Plaintiff was seen for a consultative psychiatric examination by Susan Santarpia, Ph.D. ("Dr. Santarpia"). Tr. 1491-99. Plaintiff reported symptoms including dysphoric mood, loss of interests, irritability, social withdrawal, fatigue, worry, and short-term memory deficits. Tr. 1491. Examination showed Plaintiff to have cooperative demeanor and responsiveness, and her manner of relating and overall presentation was adequate. Tr. 1492-93. She presented with a cane and back brace. Tr. 1493. She had coherent thought processes and full range of affect; mood was euthymic; attention and concentration were intact; and she could do simple one- and two-step mathematical calculations and serial 7s. Tr. 1493. Her recent and remote memory skills were grossly intact. *Id*. Her cognitive functioning was estimated to be in the average to low average range, and her insight and judgment were fair. *Id*.

Dr. Santarpia diagnosed Plaintiff with adjustment disorder with mixed anxious and depressed mood. Tr. 1494. She opined that Plaintiff presented as able to understand, remember,

and apply simple as well as complex directions and instructions; use reason and judgment to make work-related decisions; interact adequately with supervisors, co-workers, and the public; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; maintain personal hygiene and appropriate attire; and be aware of normal hazards and take appropriate precautions within normal limits. *Id*. Mild impairment was demonstrated in regulating emotions, controlling behavior, and maintaining well-being, and her difficulties were caused by stressors. *Id*. Finally, Dr. Santarpia opined that the results of Plaintiff's evaluation appeared to be consistent with psychiatric problems, which in and of itself did not appear to be significant enough to interfere with Plaintiff's ability to function on a daily basis. *Id*. Dr. Santarpia also completed a medical opinion statement opining that Plaintiff had no limitations in her ability to understand, remember, and carry out instructions; no limitations in social interaction; and no limitations in concentration, persistence, or pace. Tr. 1496-97.

On July 25, 2019, Plaintiff underwent an orthopedic examination by consultative examiner Raquel Benchoam-Ravid, M.D. ("Dr. Benchoam-Ravid"). Tr. 1500-03. Examination showed Plaintiff to be overweight; her gait without a cane had slight swinging to both sides, but there was improvement with the cane. Tr. 1501. Plaintiff could walk on her heels but not on her toes; she could squat 30% of full; and her station was normal. Tr. 1502. She used a cane that was prescribed by her doctor to avoid falls, but Dr. Benchoam-Ravid opined that it was not medically necessary. *Id*. Plaintiff needed help changing for the exam and getting on and off the exam table; she was able to rise from a chair without difficulty; and she had intact hand and finger dexterity with 5/5 grip strength bilaterally. *Id*. She had reduced cervical spine lateral flexion to both sides and lateral rotation to both sides; reduced left shoulder range of motion; full right shoulder and bilateral elbow, forearm, wrist, and finger range of motion; and upper extremity strength was 5/5. *Id*. Plaintiff had reduced lumbar spine range of motion with tenderness in the paraspinal muscles; straight leg raise

testing was positive bilaterally both sitting and supine; and her hips and left knee had reduced range of motion, but her right knee and bilateral ankles had full range of motion. *Id*. She had 5/5 lower extremity strength and mild hyperesthesia in the left lower extremity. *Id*.

Dr. Benchoam-Ravid assessed mild limitations for neck movement; marked limitations for overhead reaching; and moderate limitations for bending, squatting, kneeling, prolonged walking and standing, sitting, climbing stairs, carrying, and lifting. Tr. 1503. She opined that Plaintiff could occasionally lift up to ten pounds, sit for only twenty minutes at a time and six hours in a workday, and stand or walk for fifteen at a time. Tr. 1504-09.

On September 12, 2019, Plaintiff had a pre-operative visit at UBMD. Tr. 1571-76. She was scheduled for lumbar fusion surgery on September 16, 2019. Tr. 1571. She affirmed general "good health" and denied unintended weight loss, night sweats, chills, or fatigue. Tr. 1572. On physical examination, Plaintiff had "abnormal" gait and station and walked with a cane; examination findings were otherwise unremarkable. Tr. 1576. Her diabetes was noted to be "well controlled," and she was considered "optimized" for the planned procedure. *Id*. On September 16, 2019, Plaintiff underwent the first stage of a planned two-stage spinal fusion at L5-S1 and at L4-L5. Tr. 1658-62. The second stage was performed on October 8, 2019. Tr. 1663-66.

On November 6, 2019, Plaintiff presented to UBMD for an ER follow-up visit. Tr. 1580-84. She had been treated at the St. Joe ER on November 1, 2019, and diagnosed with shingles. Tr. 1580; *see also* Tr. 1681-86. She also had been treated at Kenmore Mercy Hospital ("Kenmore") ER on October 31, 2019, because her back wound had opened. *Id*. At Kenmore, they put steri-strips on Plaintiff's wound and sent her home. *Id*. Lab work performed at Kenmore was "normal except for Hgb of 9.5." *Id*. She still had an opening in her back and some drainage, but she had not contacted her surgeon. *Id*.

On January 15, 2020, Plaintiff presented to Horizon for a medication management visit. Tr. 1743. She reported that she was "sleeping ok for most days;" Cymbalta was working well; and she denied any issues. *Id*. Her mental status examination continued to show cooperative attitude, and she had euthymic mood, normal cognitive status, and fair insight and judgment. Tr. 1741-42

Plaintiff first argues that the ALJ failed to provide substantial support for the 5% off-task limitation provided in the RFC. *See* ECF No. 9-1 at 13-16. A claimant's RFC is the most she can still do despite her limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); Social Security Ruling ("SSR") 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional

capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Contrary to Plaintiff's arguments, the ALJ in this case thoroughly analyzed the opinion evidence and the other evidence of record in accordance with the applicable regulations[2] when

---

[2] The Court notes that new regulations regarding the evaluation of medical evidence and rescission of Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-03p, took effect on March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Because Plaintiff's DIB claim was filed on February 10, 2016, and her SSI claim on January 28, 2016, the previous regulations are applicable to her claims.

developing Plaintiff's RFC, and substantial evidence supports the ALJ's finding that Plaintiff retained the RFC to perform sedentary work with additional limitations. Tr. 27-39. *See* 20 C.F.R. §§ 404.1527, 416.927.

Plaintiff alleges that the ALJ erred in finding that Plaintiff would be off task no than more 5% of the workday, because no medical opinion supported such a "highly specific" RFC limitation. *See* ECF No. 9-1 at 13-16. However, Plaintiff's argument wrongly presumes that RFCs are medical determinations, and thus, outside the ALJ's expertise. As explained above, RFC is an administrative finding, not a medical one. Ultimately, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record as a whole. *See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017) (citing *Matta*, 508 F. App'x at 56) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").  The regulations explicitly state that the issue of RFC is "reserved to the Commissioner" because it is an "administrative finding that [is] dispositive of the case." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Moreover, there is no requirement that an ALJ's RFC finding be based on a medical opinion at all. *See, e.g.*, *Corbiere v. Berryhill*, 760 F. App'x 54, 56-57 (2d Cir. 2019) (summary order) (affirming ALJ's physical RFC assessment based on objective medical evidence); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (affirming where ALJ rejected sole medical opinion in record speaking to mental). Here, in assessing the off-task limitation, the ALJ considered a wide range of record evidence, including Plaintiff's testimony and subjective statements, treatment notes documenting physical and mental status examinations, and objective findings such as imaging results. Tr. 31, 34.

First, the ALJ noted that Plaintiff's "lumbar spine degenerative disc disease was clearly documented by imaging in the file," including lumbar spine x-rays from November 2015 showing degenerative changes (Tr. 830); a lumbar spine MRI on August 24, 2016 showing L4-5 disc protrusion to the left of midline producing moderate lateral recess stenosis (Tr. 746); and a lumbar spine MRI dated June 15, 2018 showing moderate to large central left paracentral L5-S1 disc herniation with inferior extrusion, moderate left paracentral L4-5 disc herniation with inferior extrusion, severe right L5-S1 moderate left L4-5, and mild left L3-4 neural foramen stenosis. (Tr. 974). Tr. 29.

However, the ALJ also noted that Plaintiff's primary care treatment records from JRCHC and UBMD did not include signs and findings to suggest that Plaintiff could not perform sustained work activity within the RFC found by the ALJ. Tr. 29; *see* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (consideration of objective medical evidence); For example, the ALJ noted that Plaintiff re-established care with JRCHC in June 2014, where she reported feeling well in general and "exercis[ing] a lot" despite complaints of swelling in the legs and back pain. Tr. 29, 662. A physical examination was unremarkable, and the treating nurse practitioner recommended exercise for 30 minutes a day at least four days a week. Tr. 29, 664. Subsequent treatment notes documented normal gait, mildly limited range of motion in the spine, negative straight leg raise testing, normal heel-to-toe walk and an ability to tiptoe. Tr. 29, 660. Plaintiff was instructed to remain active 60 minutes a day, avoid heavy lifting and strenuous back exercises. Tr. 29, 660-61. The provider also noted that Plaintiff was able to work with some restrictions. Tr. 29, 660. Thus, these largely unremarkable physical examination findings in 2014, with only mildly limited spine range of motion, sad attitude, and obesity, reasonably supported the ALJ's RFC finding.

The ALJ also discussed Plaintiff's treatment history at UBMD. Tr. 29-30. In 2015, physical examinations demonstrated antalgic gait, decreased range of motion in the lumbar spine, with full

strength in the lower extremities and no sensory loss. Tr. 30, 722, 809. Treatment notes dated in 2016 documented normal gait, tenderness to palpitation in the lower and mid back as well as decreased range of motion due to pain, with full strength in lower extremities. Tr. 30, 784, 786. The ALJ also noted that neurosurgical evaluations in 2016 documented slow antalgic gait, use of a cane, good strength, reflexes, and muscle tone in the lower extremities, and negative straight leg raise testing (Tr. 881-83); and an MRI of the lumbar spine in August 2016 documented L4-L5 disc protrusion and small disc protrusion at L5-S1 (Tr. 746-47). Tr. 29 31.

The ALJ further discussed Plaintiff's treatment in records in 2017 and 2018. Tr. 29-30. Plaintiff reported that her health was good, and her back pain had improved since surgery and weight loss. Tr. 30, 812. Physical examinations demonstrated normal gait, full muscle strength, and no sensory loss. Tr. 29, 815-15, 1003, 1006, 1365, 1379, 1411, 1375, 1439, 1453, 1482, 1524-25. She had full range of motion in the neck without pain, full strength in the neck, and full range of motion in the right shoulder with pain. Tr. 30, 1006. EMG testing in May 2018 documented mild carpal tunnel syndrome in the right wrist. Tr. 30, 1036-37, 1588-91.

The ALJ also noted that Plaintiff was in a motor vehicle accident in June 2018, and physical examinations thereafter demonstrated tenderness to palpitation in the cervical and lumbar paraspinal muscles; full range of motion in the neck with discomfort; and decreased range of motion in her back with pain. Tr. 30-31, 1001. An MRI of the lumbar spine documented moderate to large central left arrow central L5-S1 disc herniation, moderate left paracentral L4-5 disc herniation with inferior extrusion; and severe right L5-S1, moderate left L4-5, and mild left L3-4 neural foramen stenosis. Tr. 29, 974, 1792-94. Subsequent examinations in 2018 and 2019 documented abnormal gait, decreased range of motion in the lumbar spine, and full strength and lower extremities, positive straight leg raise testing, and a recommendation to continue with conservative treatment. Tr. 29-32, 990, 990, 1010-12, 1563. EMG testing in July 2018 documented

moderate right carpal tunnel syndrome. Tr. 32 1780-83. As the ALJ noted, Plaintiff underwent a lumbar fusion in September 2019 and was noted to be recovering "nicely" from that procedure. Tr. 33, 1761-66, 1768, 1770, 1800.

After thoroughly considering the above evidence, the ALJ reasonably determined that Plaintiff's impairments limited her to sedentary work with postural limitations and use of a cane for uneven terrain or prolonged ambulation. Tr. 29-32. The ALJ then specifically noted that he was accounting for Plaintiff's reports of pain with a 5% off-task limitation, crediting Plaintiff's subjective complaints in the context of the objective medical evidence. Tr. 31.

The ALJ also appropriately considered Plaintiff's mental health treatment notes when assessing the off-task limitation. Tr. 32-34. The ALJ specifically noted that he accounted for Plaintiff's anxiety and depression with limitations to simple routine tasks and decisions, as well as 5% off-task behavior. Tr. 34. As the ALJ noted, Plaintiff was generally cooperative at her appointments (Tr. 33, 1855, 1865-66, 904-05), and mental status examinations in 2015 demonstrated normal mood, affect, judgment, and insight (Tr. 29-30, 722, 809). In 2016, Plaintiff had logical thought process, appropriate thought content, intact memory and attention, good insight and judgment, and she reported that Lexapro was helpful. Tr. 30, 33, 822, 865-66, 869. In 2017 and 2018, Plaintiff reported being stressed with caring for her grandson daily and caring for her mother who was sick with shingles. Tr. 33, 906. On examination, Plaintiff had normal and stressed mood, normal cognition, fair insight and judgment, and logical thought process. Tr. 30, 33-34, 815-16, 910-12. Treatment notes in 2018 and 2020 documented normal mood and cognitive status, as well as normal or fair insight and judgment. Tr. 30, 34, 995, 1741-42. Based on this evidence, the ALJ reasonably limited Plaintiff to unskilled work consisting of simple routine tasks and decisions, as well as a 5% off-task limitation. Tr. 34.

In addition to considering the objective medical evidence, the also ALJ appropriately considered Plaintiff's activities of daily living. Tr. 38-39; *see* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (consideration of objective medical evidence); 404.1529(c)(3)(i), 416.929(c)(3)(i) (consideration of daily activities). The ALJ also noted that Plaintiff's statements were not fully consistent with the objective medical. Tr. 38. For example, Plaintiff alleged asthma attacks twice a month, but the medical evidence in the record does not corroborate those symptoms. Tr. 38, 433-42. Moreover, noted the ALJ, the longitudinal examination findings did not fully support Plaintiff's claims that she had to lay down for most of the day and could not leave her home due to her physical and mental symptoms. Tr. 38, 433-42. To the contrary, Plaintiff reported an ability to perform light cooking, cleaning, laundry, shopping, and driving; she socialized at church with friends; she read, watched television, listened to music, and read; and took care of the basic needs of her home and children, Tr. 38, 667-69, 734-38, 1491-98. She was also the primary caregiver for her grandson. Tr. 38, 1491-98. Thus, the ALJ considered the totality of the record and pointed to substantial evidence to support an RFC for sedentary work, including a limitation that Plaintiff would be off task no more than 5% of the workday. Tr. 27-28. *See Monroe*, 676 F. App'x at 9 (holding that the ALJ could rely on treatment notes and activities of daily living to formulate the RFC assessment); *see also Voght v. Saul*, 18-cv-1435-MJR, 2020 WL 3410837, at *5 (W.D.N.Y. June 19, 2020) (holding that the ALJ could rely on a claimant's statements about her daily activities in support of the RFC finding).

Despite the ALJ's thorough and well supported explanation for the off-task limitation, Plaintiff nevertheless argues that more specific evidence is needed regarding the amount of time Plaintiff would be off task. *See* ECF No. 9-1 at 13-16. Contrary to Plaintiff's argument, however, "[t]he fact that the ALJ assigned a particular percentage range . . . to illustrate [Plaintiff's] limitation does not undermine the fact that the ALJ's finding was supported by substantial evidence." *Johnson*

*v. Colvin*, 669 F. App'x 44, 47 (2d Cir. 2016); *see also Mohamed v. Saul*, No. 3:18CV02015 (SALM), 2019 WL 3928585, at *11 (D. Conn. Aug. 20, 2019) (gleaning from the ALJ's decision that he gave plaintiff "the benefit of the doubt[ ]" when formulating the off-task time limitation in the RFC, as it appeared the ALJ did so due to plaintiff's complaints of pain documented throughout the record); *Kirkland v. Colvin*, No. 15-cv-6002P, 2016 WL 850909, at *12 (W.D.N.Y. Mar. 4, 2016) (finding that the ALJ did not err by assessing specific limitations that did not precisely correspond to any medical opinion because the claimant's daily activities, treatment history, and consultative examiner's opinion supported the limitations).

Furthermore, the opinion evidence in this case supports the ALJ's off-task determination. For example, the ALJ considered the opinion of consultative examiner Dr. Zali, who opined that Plaintiff had no limitations in her ability to maintain attention and concentration and maintain a regular schedule. Tr. 34, 734-38. The ALJ afforded Dr. Zali's opinion some weight because she was an examining source, and her opinion was somewhat supported by her examination findings and the evidence in Plaintiff's treatment records. Tr. 34. However, the ALJ explained that Dr. Zali's opinion that Plaintiff had marked limitations appropriately dealing with stress was not supported by the treatment records, such as evidence showing that Plaintiff had continued stress, but she managed it well. Tr. 34, 907. Therefore, the ALJ reasonably gave that portion of Dr. Zali's opinion little weight. Tr. 34.

The ALJ also considered the opinion of state agency psychological consultant Dr. Ochoa, who opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace, and would be able to complete simple and mildly complex tasks with sustained attention and pace tolerance. Tr. 34-35, 153. The ALJ gave Dr. Ochoa's opinion substantial weight, explaining that, although Dr. Ochoa was not a treating or examining source, Dr. Ochoa's opinion was supported by, and consistent with, Plaintiff's generally unremarkable examination findings

including treatment records showing stressed or depressed mood but otherwise cooperative behavior, intact cognition, and fair insight and judgment, and consistent with Dr. Zali's examination findings of mildly impaired memory but intact attention and concentration, cooperative attitude, and limited insight but fair judgment. Tr. 34-35.

The ALJ also considered the opinions of consultative examiners Dr. Santarpia and Dr. Ransom. Tr. 34-36. Dr. Santarpia opined that Plaintiff had no limitations in her ability to perform the basic mental demands of work and mild limitations regulating her emotions, controlling behavior, and maintaining well-being. Tr. 34-35, 1491-98. Dr. Ransom similarly opined that Plaintiff had no limitations performing simple tasks independently, following an understanding simple directions and instructions, maintaining attention and concentration for simple tasks, maintaining a simple regular schedule, and learning simple tasks; and mild limitations performing complex task, relating adequately with others, and appropriately dealing with stress. Tr. 35-36, 667-70. However, the ALJ gave Dr. Santarpia and Dr. Ransom's opinions little weight, finding that they were inconsistent with the longitudinal mental health treatment notes in the record, which the ALJ determined warranted the additional limitations assessed in the RFC. Tr. 35-36.

After assessing the above opinion evidence, as well as Plaintiff's treatment history and activities of daily living, the ALJ gave Plaintiff the benefit of the doubt and reasonably concluded that she would be off task 5% of the workday. Tr. 27-28.  Plaintiff repeatedly cites to *Cosnyka v. Colvin*, 576 Fed. App'x 43, 46 (2d Cir. 2014), to support her argument that the ALJ's off-task limitation was not supported by substantial evidence because it was not based on a medical opinion. *See* ECF No. 9-1 at 14-16. However, *Cosnyka* is readily distinguishable from the current case.  Unlike *Cosnyka*, where nothing in the record supported the ALJ's conclusion and indeed some evidence was "to the contrary," as discussed above, the ALJ in this case sufficiently explained that he included the 5% off-task limitation due to Plaintiff's anxiety and depression and

her subjective complaints of pain. Tr. 31, 34. Accordingly, substantial evidence in the record supports the ALJ's finding that Plaintiff would be off task no more than 5% of the workday. *See Johnson*, 669 F. App'x at 47 (highly specific RFC findings are not problematic when supported by substantial evidence in the record).

Plaintiff's second point—that the ALJ erred in his consideration of the opinions of Dr. Zali and Dr. Ochoa—is similarly unavailing. *See* ECF No. 9-1 at 17-21. Contrary to Plaintiff's argument, the ALJ's decision reflects that he engaged in the same thorough analysis when considering Plaintiff's mental impairments and limitations and properly evaluated Plaintiff's mental impairments in accordance with the "special technique" described in 20 CFR 404.1520a and 416.920a. Specifically, the ALJ must assess the claimant's degree of functional limitation resulting from a mental impairment in four broad functional areas identified in Paragraph B of the adult mental disorders listings: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting or maintaining pace; and (4) adapting or managing oneself. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

While the analysis at this step is not equivalent to the RFC determination., the ALJ explicitly incorporated this analysis when assessing Plaintiff's functional limitations in the RFC portion of the decision. Tr. 27 ("The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis."). *See Reyes v. Colvin*, No. 13CV4683, 2015 WL 337483, at *19 (S.D.N.Y. Jan. 26, 2015) (finding that "[b]ecause the ALJ's reasoning behind Reyes's RFC assessment reflected the same reasoning he used in assessing the presence of "Paragraph B" criteria [at step three], the ALJ was not required to provide the same reasoning twice."); 20 C.F.R. §§ 404.1522(5), 416.922(5).

The ALJ found that Plaintiff had a moderate limitation in understanding, remembering, or applying information. Tr. 26. In so finding, the ALJ considered Plaintiff's complaints of

forgetfulness, as well as her self-reported ability to follow spoken, and written instructions, pay bills, count change, and handle a savings account. Tr. 26, 440, 479, 482. Based on mental status examinations showing intact attention, fair concentration, and normal cognitive status, the ALJ also found no more than moderate limitations in Plaintiff's ability to concentrate, persist, or maintain pace. Tr. 26-27, 666-70, 671-75, 733-38, 834-78, 902-14, 1491-98, 1704-47. The ALJ also noted that Plaintiff had moderate limitations interacting with others. Tr. 26. She reported an ability to go shopping, to doctor's appointments, to her child's school, and to church or dinner events once a week. Tr. 26, 436, 438, 440, 478-80, 482. She also reported no problems getting along with people in authority. Tr. 482. Finally, the ALJ found that Plaintiff had mild limitations adapting or managing herself. Tr. 27. The ALJ noted that Plaintiff alleged stress or changes in her schedule affected her thought process and mood (Tr. 441); however, mental status examinations consistently documented fair insight and judgment (Tr. 679-92, 703, 904-05, 910-11, 1705-1747). Tr. 27.

The ALJ's analysis of Plaintiff's mental impairments and functional limitations continued at the RFC discussion. Tr. 33-36. Mental health treatment notes revealed that Plaintiff reported stress when caring for her grandson daily as well as caring for her mother who was sick with shingles. Tr. 33, 906, 912. As previously discussed, the ALJ also considered Dr. Zali's opinion that Plaintiff had marked limitations appropriately dealing with stress. Tr. 34, 734-38. Plaintiff contends that the ALJ erred in rejecting Dr. Zali's marked limitations dealing with stress, but this argument is without merit. *See* ECF No. 9-1 at 17. As discussed above, however, the ALJ reasonably rejected Dr. Zali's stress limitation in light of the medical evidence documenting Plaintiff's capacity to appropriately deal with stress. Tr. 34, 734-38, 907, 912. *See Veino*, 312 F.3d at 588 ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

Plaintiff also takes issue with the ALJ's reliance on state agency psychologist Dr. Ochoa's opinion. *See* ECF No. 9-1 at 19-20. Dr. Ochoa opined that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace and could complete simple and mildly complex task with sustained attention and pace tolerance, interact with others to meet work needs, adapt to work related changes, and make work related decisions. Tr. 152-53. As discussed above, the ALJ reasonably gave Dr. Ochoa's opinion substantial weight because it was consistent with Plaintiff's generally unremarkable examination findings, including Dr. Zali's examination findings of mildly impaired memory but intact attention and concentration, cooperative attitude, and limited insight but fair judgment. Tr. 34-35. Furthermore, a state agency consultant's opinion can constitute substantial evidence when it is well supported and consistent with the record as a whole. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1); *see Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (ALJ properly credited state agency consultant's opinion over plaintiff's treating physician's opinion because the former was more consistent with the record); *Christina v. Colvin*, 594 F. App'x 32, 33 (2d Cir. 2015) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluations."). Thus, there was nothing improper in the ALJ's reliance on Dr. Ochoa's assessment.

As previously noted, Plaintiff bears the ultimate burden of proving that she was more limited than the ALJ found. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so."); *Poupore*, 566 F.3d at 306 (it remains at all times the claimant's burden to demonstrate functional limitations, and never the ALJ's burden to disprove them). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do.

31

Based on the foregoing, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which she has failed to do. The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude* otherwise." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original). As the Supreme Court explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

<u>**CONCLUSION**</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 10) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE